**In re Arthur P. STRASNICK, Debtor.**

**Michael E. Moecker of Michael Moecker & Associates, Inc., As Assignee of Little Angel Foods, Inc., Plaintiff,**

**v.**

**Arthur P. Strasnick, Defendant.**

**Bankruptcy No. 99–6955–3F7.
Adversary No. 99–399.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Nov. 8, 2000.

**332**

Richard R. Thames, Stutsman & Thames, P.A., Jacksonville, FL, for Plaintiff.

Robert Altman, Palatka, FL, for Defendant.

Charles W. Grant, Jacksonville, FL, Chapter 7 Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Proceeding is before the Court on the Complaint Seeking Denial of Discharge and Exception to Discharge filed on December 15, 1999 by Michael E. Moecker of Moecker & Associates ("Plaintiff"), assignee of the assets of Little Angel Foods, Inc., ("Little Angel") a defunct Daytona, Florida bakery, pursuant to Florida Statutes § 727.101 *et seq.* On January 24, 2000, Arthur P. Strasnick ("Defendant"), former vice president and chief operating officer of Little Angel, answered the Complaint and demanded attorney's fees. On August 22, 2000 a trial was conducted. Based on the evidence presented at trial and upon the subsequent arguments and submissions of counsel, the Court denies Defendant's discharge pursuant to 11 U.S.C. § 727(a)(2).

## FINDINGS OF FACT

In early 1997, Little Angel obtained a $630,000 loan from the Commercial Bank of Volusia County to finance plans for the expansion of its burgeoning bakery business. Little Angel simultaneously entered into an equipment lease agreement with Orix Credit Alliance, Inc. ("Orix"). The lease agreement required a $500,000 down payment to the equipment dealer.

The angels stopped smiling on the bakery soon thereafter. The equipment dealer absconded with the $500,000. Little Angel had to cough up another $500,000 for the equipment. Meanwhile, Little Angel's theft and conversion suit against the equipment dealer stalled.

Soon thereafter Little Angel found its pocket picked clean once more. A secretary allegedly embezzled about $62,000.00 from the bakery, which was quickly running short on dough. The corporation never recovered any of the allegedly lifted loot.

In August, 1997, Little Angel lost its largest client, Publix Supermarkets ("Publix"). According to Debtor, Publix accounted for 60% of Little Angel's income.

Plaintiff contends that Little Angel became insolvent by September, 1997, as a direct result of the loss of the Publix account. Debtor testified that Little Angel had almost completely recovered one year after losing the Publix account, and that Little Angel did not become hopelessly insolvent until February of 1999.

Defendant admitted that the officers of Little Angel consulted with a corporate bankruptcy attorney, David Otero, six to eight months after losing the Publix account.

In July 1998, Little Angel executed a $75,000.00 promissory note in favor of Defendant. (Def.'s Ex. 1).

In December, 1998, one of many unpaid Little Angel creditors obtained a writ of garnishment and levied upon Little Angel's accounts at South Trust Bank.

In February, 1999, Defendant filed a UCC–1 Filing Statement (Pl.'s Ex. 56) recording a security interest in all of Little Angel's assets pursuant to the February,

1998 promissory note. Polzella and O'Meara undertook similar steps in order to establish priority for their insider debts.

On March 2, 1999, Debtor formed a new corporation, Sunshine Bakeries, L.L.C. ("Sunshine Bakeries") as part of Otero's suggested bankruptcy preparation plan. Sunshine Bakeries never operated as a business and never opened a bank account.

On May 14, 1999, Defendant filed a Financial Affidavit in his then-pending divorce from ex-wife Gisele Strasnick. Defendant swore in the Affidavit that he owned jewelry with a value of $25,000.00. Defendant valued his other personal property at $75,000.00. Defendant testified that the jewelry and personal property was owned jointly with his wife and that she took possession of the valuables after the divorce. However, Defendant admitted in a deposition that he had been separated from his ex-wife for seven or eight years prior to the divorce and that there were no joint, marital assets at the time of the divorce.

On May 21, 1999, the Commercial Bank of Volusia County called in the $630,000.00 note on Little Angel's new facility. Little Angel's cookie had finally crumbled, and it ceased operations that day.

On May 25, 1999, after a six-month search for a buyer, a holding company, Little Angel Acquisition, Inc., L.L.C., finally purchased Little Angel's assets and began operating as Carmine's Bakery.

Defendant, Polzella and O'Meara then began to dole out the crumbs.

Little Angel transferred some $281,187.82 into the accounts of Backstreet Associates, Inc., a dummy corporation owned by Defendant that existed only as a bank account holder, between May 26, 1999 and June 14, 1999. Defendant testified that he baked up Backstreet as an internet consulting company. Backstreet never operated as a business. Defendant testified that the money was pumped into the dormant Backstreet accounts because Little Angel's principals feared future levies on cash in Little Angel's accounts.

Defendant admitted that he, Polzella and O'Meara intended to disburse Little Angel's remaining cash to preferred creditors.

Most of the pie, about $231,696.28, went to settle the claims of Little Angel's trade creditors and to pay Otero's fees.

On June 17, 1999, Defendant, Polzella and O'Meara gave themselves a piece. Little Angel wrote checks to the partners totaling $50,000.00 from the Backstreet accounts. Defendant received a check from Little Angel for $35,000.00. (Pl's Ex. 46.) Polzella received a $12,000.00 check and O'Meara received $8,000.00. (Pl's Ex. 47, 48.)

Defendant testified that the money was owed him and his partners for back pay.[1] Little Angel owed Defendant about $8,000.00 for corporate purchases made on his personal credit card. Defendant filed a claim for $68,000.00 against Little Angel in the Assignment for the Benefit of Creditors. (Pl.'s Ex. 49).

The payments to trade creditors and the insiders left little more than $1,000.00 in the Backstreet accounts as of July 6, 1999, when Little Angel's few remaining assets, essentially the proceeds of the asset sale, were assigned to Plaintiff.

Defendant testified that $15,000.00 of the Little Angel check went to his then-girlfriend Jane Strasnick (nee Schwartz) ("Schwartz") to pay off a past loan, for which Defendant did not provide any documentation. Defendant made a $10,000.00 advance lease payment on Schwartz' car. Defendant made $4,000.00 in home repairs. Finally, Defendant gave $5,000.00 to his daughter, Michelle Enos ("Enos").

---

1. Defendant testified that he had not been paid for five or six months out of the final three years of Little Angel's existence.

Soon thereafter Defendant liquidated $6,900.00 in mutual funds. Defendant testified that he paid some of the money to bills and used some to pay down his second mortgage.

On July 6, 1999, Little Angel filed a petition for an Assignment for the Benefit of Creditors in the Circuit Court in and for Volusia County, Florida. (Pl's Ex. 2). Pursuant to FLA. STAT. § 727, the state of Florida appointed Plaintiff to oversee the Assignment.

The cash and receivables flowing into Backstreet were excluded from the Assignment by agreement with Commercial Bank of Volusia County. Defendant testified that he regularly consulted with Plaintiff about the disposition of the cash and receivables. There was only a pittance left after Defendant and his partners went about settling with trade creditors and paying themselves during May and June.

Defendant admitted that Little Angel did not declare bankruptcy at least partially because some of the payments from Little Angel to Backstreet and then to him

and the other shareholders may have been preferential and avoidable in bankruptcy.

Defendant also testified that Otero advised him that a bankruptcy would be considerably more expensive than an assignment for the benefit of creditors.

On September 9, 1999, Defendant filed a voluntary Chapter 7 petition in this Court, Case No. 99–06955–BKC–3F7.

In Defendant's Statement of Financial Affairs (Pl's Ex. 1), he listed as personal property $75.00 worth of jewelry and $4,500.00 worth of office furniture.

Defendant did not mention his interest in Sunshine Bakeries in his schedules. Sunshine Bakeries never opened its doors or any bank accounts.

Defendant's Schedule F (Pl.'s Ex. 1) indicated that he owed a total of $2,041,223.66 to unsecured, nonpriority creditors. Defendant indicated in his Schedule H that Polzella, O'Meara and Little Angel were co-debtors on $1,981,-223.66, or 94.7%, of his total unsecured, priority indebtedness.[2] Only $107,497.44,

---

**2.** A comparison of Little Angel's Assignment for the Benefit of Creditors' Claims Register and Defendant's Schedule F leads the Court to conclude that the vast majority of Defen-

dant's debts stem from personal guarantees or partnership liabilities on Little Angel debts. The types of vendors involved and the close amounts owed support this conclusion.

| Creditor | Debt Owed by Little Angel | Debt listed on Schedule F |
|---|---|---|
| American Express Optima | $30,000.00 (no claim filed) | $31,000.00 |
| Associated Leasing | $36,000.00 (no claim filed) | $24,782.83 |
| Best Brands | $84,741.22 claim filed | $66,000.00 |
| Bombardier | $66,172.50 claim filed | $51,000.00 |
| CCM Electric | $16,299.32 claim filed | $17,000.00 |
| Colonial Pacific | $24,401.14 claim filed | $25,000.00 |
| Conti Leasing | $57,106.00 (no claim filed) | $57,106.00 |
| Dawn Foods | $71,000.00 (no claim filed) | Notice only |
| Forrest Financial | $53,000 debt, $33,426.46 claim filed | $53,000.00 |
| Friendship Dairy | $27,988.00 claim filed | $29,000.00 |
| Granite Financial | $103,000.00 (no claim filed) | $70,000.00 |
| Green Tree Vendor Services | $25,000.00 (no claim filed) | $38,000.00 |
| Icon Funding | $65,949.57 debt, $55,799.28 claim filed | $65,949.57 |
| Imperial Business Credit | $108,379.65 (no claim filed) | $20,000.00 |
| Jameson Transport | $69,691.70 claim filed | $56,000.00 |
| Phelps Engineering | $50,000.00 (no claim filed) | $60,000.00 |
| Kraft Foods | $86,676.86 claim filed | $86,000.00 |
| Network Leasing | $4,300.00 debt, $7,194.25 claim filed | $4,500.00 |
| Newcourt Financial | $173,422.53 (no claim filed) | $173,422.53 |
| Orix | $364,916.43 debt, $388,211.27 claim filed | $364,916.43 |

or 5.3%, of Defendant's total declared indebtedness was not owed to Little Angel creditors.

Little Angel was not listed as one of Defendant's creditors. Neither Little Angel nor Plaintiff filed a claim against Defendant's estate.

On January 19, 2000, the Chapter 7 Trustee in Defendant's case, Charles W. Grant ("Grant"), filed an adversary Complaint, No. 00–24, seeking to avoid Defendant's $5,000.00 gift to daughter Michelle Enos as a fraudulent transfer. Grant simultaneously filed another adversary Complaint, No. 00–25, seeking to recover Defendant's $15,000.00 payment to Jane Strasnick as a preference.

Both adversaries were dismissed by the Court on account of Grant's failure to timely file for default. (Adv. 00–24, Doc. 7; Adv. 00–25, Doc. 7.)

## CONTENTIONS OF THE PARTIES

Plaintiff contends that Defendant should be denied discharge pursuant to 11 U.S.C. § 727(a)(2), which provides for denial of discharge for a debtor who improperly transferred property of his estate within a year before filing a bankruptcy petition with the intent to hinder, delay or defraud creditors. Plaintiff further asserts that Defendant's debt to Little Angel should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4), which provides for the exception from discharge of debts incurred for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny.

Defendant counters that Plaintiff has no standing to object to his discharge because Plaintiff is not a creditor of Defendant. Defendant further argues that he owes no debt to Little Angel, and therefore such nonexistent debt may not be excepted from discharge. Defendant finally asserts that any transfers of estate property were not improper or made with the intent to hinder, delay or defraud creditors, and that Defendant did not stand as a fiduciary of Plaintiff.

## CONCLUSIONS OF LAW

### I. OBJECTION TO DISCHARGE UNDER § 727(a)(2)(A).

#### A. Standing to object to discharge under § 727(c)(1).

■ Defendant argues that Plaintiff does not have the statutory standing to object to Defendant's discharge under § 727(c)(1), which provides that only a creditor, trustee, or the U.S. Trustee may object to discharge under § 727. *See* 11 U.S.C. § 727(c)(1) (2000). The Code defines a creditor as "an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A) (2000). A claim is defined as "a right to payment, whether or not such right is reduced to judgment." 11 U.S.C. § 101(5)(A) (2000).

| | | |
|---|---|---|
| Progressive Leasing | $10,653.68 (no claim filed) | $10,553.68 |
| RYA Monarch | $281.877.78 debt, $284,937.28 claim filed | $284,937.28 |
| Raskas Foods | $66,136.00 debt, $62,136.00 claim filed | $68,000.00 |

The debt listed in Little Angel's claims register is the debt as estimated by Little Angel; some creditors did not file claims on these estimated debts or filed claims of differing amounts, most likely because of the futility of any collection efforts or because of settlements with Little Angel. Debtors' Schedule H indicates that Polzella, O'Meara and Little Angel are co-debtors on all of the above-listed debts except for the Newcourt Financial and Dawn Foods accounts. The Court presumes that these are most likely clerical omissions, as the nature of these creditors indicates that they are likely Little Angel vendors. Additionally, the amount of the Newcourt claim as stated by Little Angel and the amount admitted to by Defendant are identical. Further, C.I.T. Group, Dolphin Financial, Copelco, Leaseworld and Melvin Fields are not on the Register but are on Schedule F and are listed as Little Angel co-debts by Defendant in Schedule H.

The Eleventh Circuit has not addressed the issue of whether or not an assignee of a corporation's assets may object to the discharge of the assignor's officer on § 727(a)(2) grounds where the assignee has not claimed or asserted any particular debt directly against the officer.

Plaintiff correctly points out that courts have stretched the definition of "creditor" to those representing true creditors under color of statute, and to those with statutory power to pursue actions to collect on behalf of true "creditors."

 A Chapter 7 trustee in a third party's bankruptcy case may object to the discharge of a debtor in a separate case if the third party trustee has some claim against the debtor, such as a preference or avoidance claim. *See Solomon v. Barman (In re Barman),* 244 B.R. 896, 899 (Bankr. E.D.Mich.2000). The court in *Barman* was faced with an objection to discharge filed by the Chapter 7 trustee in the debtor's parents' bankruptcy case. *See id.* at 899. The court found that the third-party trustee could bring suit because the third-party trustee had a possible preference claim against the children's bankruptcy estate. *See id.* at 899. The court noted that such a trustee was not truly a third party because the parent's bankruptcy estate had some particular, direct claim against the debtor that might be affected by discharge of the debtor. *See id.* The *Barman* court found that a Chapter 7 trustee, standing in the place of a party with a particular, direct claim, has standing as a "creditor" object to the discharge of any party from whom that claim may be collected. *See id.*

 Additionally, an entity that has been given authority by statute to collect on a particular, direct claim against a debtor has standing to bring an adversary proceeding seeking exception to discharge pursuant to 11 U.S.C. § 523(a). *See Fezler v. Davis (In re Davis),* 194 F.3d 570 (5th Cir.1999). In *Davis,* the administratrix of the probate estate of a person shot dead by a debtor sued to have any claim arising from a future wrongful death suit against the debtor excepted from discharge. *See id.* at 571. The court concluded that the administratrix had standing to seek exception to discharge. *See id.* at 578. The court reached this conclusion by extending the holding of *Nathanson v. National Labor Relations Board,* 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952) to administratrices appointed under a wrongful death statute. The court found that *Nathanson* stood for the principle that an entity with the statutory authority to bring suit in its own name or for the ultimate benefit of others has standing to seek an exception to discharge if the parties represented had a particular, direct claim against the debtor. *See Davis,* 194 F.3d at 575. The court found that failure to grant such entities standing might unduly hinder a state's ability to implement and enforce the law that created the statutory authority or entity seeking to attack discharge. *See id.*

The Court finds that the rationale in *Davis* applies to § 727 objection standing as well as § 523 exceptions standing. The *Nathanson* principal functions in both contexts; refusal to allow a statutory representative to object to discharge could also unduly hinder a state's ability to implement its laws regarding suits brought by representatives.

The Court finds that both *Barman* and *Davis* operate to extend the meaning of "creditor" in § 727(c)(1) to include Plaintiff. First, Plaintiff is an entity assigned the duty of enforcing a particular, direct statutory claim through collection activities. Plaintiff, an assignee for the benefit of Little Angel's creditors, is charged by Florida Statutes § 727.108 with collecting the assets of the estate for distribution to creditors. This task includes the pursuit of contribution from co-debtors of the estate. Defendant admits in his Schedule H that he is a co-debtor of the estate on almost $2,000,000.00 worth of Little Angel's debts.

Additionally, Plaintiff represents Little Angel's creditors, who may have suits against Defendant for the money he preferentially paid out of Little Angel and perhaps suits under personal guarantees or partnership liability. Those common creditors have particular, direct claims against Defendant. It would be inequitable to bar the statutory representative of those creditors from objecting to Defendant's discharge.

Such a result would also impede the goals of the Florida legislature in enacting § 727.108. An unscrupulous corporate director could cripple the Assignment process by carefully carving up a company before tossing scraps to creditors and then avoiding personal obligations on corporate debts by hiding behind personal bankruptcy.

The Court's conclusion is confirmed by a commonsense interpretation of the close and interwoven relationship between Plaintiff, Defendant, Little Angel, and Little Angel's creditors. Defendant is in bankruptcy because of Little Angel's debts, not because of his own. Defendant owes almost 95% of the debt to be discharged to creditors of Little Angel. It makes sense that Plaintiff may act against discharge on behalf of those common creditors against Defendant.

Therefore, Plaintiff has standing and the Court may proceed to decide whether or not Defendant's discharge should be denied on § 727(a)(2) grounds.

**B. The § 727(a)(2)(A) standard for denial of discharge and application to the instant case.**

Section 727 provides in relevant part that:

The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mu-

tilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition . . .

11 U.S.C. § 727(a) (West 2000).

**1. Objection to discharge in general.**

■ The Bankruptcy Code favors discharge of the honest debtor's debts and provisions denying this discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *See Cohen v. McElroy (In re McElroy)*, 229 B.R. 483, 487 (Bankr. M.D.Fla.1998). However, there are limitations on the right to a bankruptcy discharge.

■ Federal Rule of Bankruptcy Procedure 4005 provides that the initial burden of proof on an objection to discharge lies with the plaintiff. FED. R. BANKR. P. 4005. Plaintiff bears the initial burden of proving, by a preponderance of the evidence, that Debtor's discharge should be denied. *See Grogan v. Garner*, 498 U.S. 279, 285–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *see also Hawley v. Cement Indus., Inc. (In re Hawley)*, 51 F.3d 246, 249 (11th Cir.1995); *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *Manhattan Leasing Sys., Inc. v. Goblick (In re Goblick)*, 93 B.R. 771, 775 (Bankr. M.D.Fla.1988). However, once Plaintiff meets the initial burden, Debtor has the ultimate burden of persuasion. *See id.* Debtor must show by a preponderance of the evidence that he is entitled to a discharge. *See Clark v. Wilbur (In re Wilbur)*, 211 B.R. 98, 101 (Bankr.M.D.Fla. 1997).

**2. Denial of discharge under § 727(a)(2)(A).**

■ Under § 727(a)(2)(A), the objecting party must prove by a preponderance of the evidence that: (1) a transfer occurred; (2) the transfer was of debtor's property; (3) the transfer was within one

year of the petition, and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee. *See Williamson Const., Inc. v. Ross (In re Ross),* 217 B.R. 319, 323 (Bankr.M.D.Fla. 1998) (citations omitted). In order to find fraudulent intent, the Court can consider circumstantial evidence or can infer it from the debtor's action. *See Ingersoll v. Kriseman (In re Ingersoll),* 124 B.R. 116, 121 (M.D.Fla.1991). "Badges of Fraud" are strong indicators of fraudulent intent. *See id.* These "Badges of Fraud" include: (1) lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) retention of possession for use and benefit; (4) financial condition of the transferor before and after the transfer; (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit; and (6) general chronology and timing of events. *See id.* at 121–22. "Extrinsic evidence of fraud, for purposes of defeating discharge, can be comprised of conduct intentionally designed to materially mislead or deceive creditors about a debtor's position; conveyances for less than fair value; or continued retention, benefit, or use of property allegedly conveyed together with evidence that conveyance was for inadequate consideration." *Siegel v. Weldon (In re Weldon),* 184 B.R. 710, 713 (Bankr.D.S.C.1995) (citing *Panuska v. Johnson (In re Johnson),* 880 F.2d 78, 82 (8th Cir.1989)).

### 3. Application to the instant case.

The Court notes that in most § 727(a)(2)(A) cases the outcome hinges on permissible inferences of intent from a debtor's behavior. The Court finds it useful to examine the bounds of permissible inference as explored in a recent decision before proceeding on to direct application of the § 727(a)(2)(A) standards and factors.

### a. Precedential guidance

The Court finds specific guidance in its decision in *Shappell's, Inc. v. Perry (In re Perry),* 252 B.R. 541 (Bankr.M.D.Fla. 2000). In *Perry,* debtor shuffled money, equipment and insurance among several family-owned shell corporations with little concern for the vagaries of accounting. *See id.* at 545. Debtor failed to provide documentation supporting his explanations of various transfers and withdrawals. *See id.* Debtor admitted that he had cleaned out the accounts of one of his corporations in order to prevent creditors from levying on its assets and on his own. *See id.* The Court found that debtor had preferentially paid some of the business creditors in order to keep the business afloat. *See id.* at 548. Debtor admitted that some of the information on his schedules was inaccurate. *See id.* at 545. The Court noted that debtor explained away all of his mysterious transfers as "loans," but that debtor could not produce any evidence of these loans or any receipts proving satisfaction of such loans. *See id.* at 546. Debtor supplied the Court with little more than some "vague recollection" of his financial condition in the months before the petition date. *See id.* The Court found that debtor could be denied discharge on § 727(a)(2)(A) grounds. *See id.* at 547. The Court found that the debtor's "jockeying funds between family-run business entities to avoid such funds being levied by his creditors" constituted sufficient evidence to infer an intent to hinder, delay or defraud creditors. *See id.* at 547. The Court also found that the involvement of his family supplied a powerful "badge of fraud" from which to infer such intent. *See id.* at 548.

The Court in *Perry* inferred intent to defraud from a course of conduct followed almost to the letter by Defendant. It is as if Defendant used the *Perry* factual findings as a business plan. Defendant in the instant case went further afield than the debtor in *Perry,* however. Defendant proceeded to transfer money not only from Little Angel to Backstreet but then to himself and then one step further—to his

then-girlfriend and daughter. Defendant exhibited the same elusive, vague demeanor in his testimony that the debtor in *Perry* displayed. Defendant similarly offered no reliable documentary evidence supporting his claim that the payment to Schwartz, then his girlfriend and now his wife, was in repayment for a loan, or that the advance lease payments were in satisfaction of some past debt. All Defendant had to back him up was a two-year-old promissory note evidencing a $75,000.00 debt to Defendant that Defendant, as Little Angel's president, probably drafted himself. Defendant most likely also drafted the UCC-1 financing statement granting him a security interest in all of Little Angel's assets at a point where the bakery was hopelessly insolvent.

**b. Conclusion: The preponderance of the evidence establishes that Defendant transferred property within one year of filing his petition with the intent to hinder, delay or defraud creditors.**

**1. "Transferred property."**

■ The Debtor clearly transferred property of the estate within one year of filing his Chapter 7 petition. Defendant transferred $10,000.00 in advance lease payments on Schwartz' car. Defendant transferred $15,000.00 to Schwarz. Defendant gave $5,000.00 to Enos. Defendant converted $4,000.00 in cash from the liquidation of his non-exempt mutual funds into exempt property by spending it on home repairs.

Defendant caused Little Angel to transfer almost $300,000.00 to Backstreet and then again to preferred creditors, including $35,000.00 to himself and $15,000.00 to his partners. Though this property did not directly belong to debtor, it did effect the 95% of Defendant's scheduled unsecured debt that stems from a particular, direct claim against Little Angel. Little Angel's property therefore should be considered property "of the debtor" for purposes of establishing transfers, since Defendant's and Little Angel's property constituted a common pool from which repayment was available to common creditors.

**2. "Within one year of filing his petition."**

It is undisputed that all of the relevant transfers took place between September 9, 1998 and September 9, 1999, the petition date.

**3. "With the intent to hinder, delay, or defraud creditors."**

The Court finds that the evidence presented by Plaintiff supports an inference that Defendant went about the transfers from Little Angel to Backstreet and then to preferred creditors, himself, and on to Schwartz and Enos with the intent to hinder, delay, and defraud creditors. The Court will address this chain of fraudulent transactions one link at a time.

First, Defendant conceded that cash and receivables were transferred from Little Angel's accounts into Backstreet's in order to hinder creditors seeking to levy on the accounts.

Second, Defendant also admitted that the payments from the Backstreet accounts to certain creditors were preferential. Defendant stated that the avoidability of such transfers in bankruptcy at least partially motivated Little Angel's choice to petition for an Assignment for the Benefit of Creditors. Defendant himself received $35,000.00 and a recorded lien on all of Little Angel's assets as a preferred, insider creditor.

Third, the circumstances of the transfers between Defendant and Schwartz and between Defendant and Enos give rise to an inference of fraudulent intent. The Court finds several badges of fraud present. First, Defendant provided no documentation to support his assertion that the $10,000.00 lease payment and the $15,000.00 cash payment to Schwartz were on account of an antecedent debt. Defen-

dant admitted that the $5,000.00 to Enos was a gift. Therefore, neither transfer was supported by adequate consideration. Second, Defendant had a close family tie with Schwartz, whom he later married, and Enos, his daughter. Third, since Defendant and Schwartz are married and presumably share some moneys and property, it is likely that Defendant has retained possession of the leased car and the cash to some extent. Fourth, the transfers occurred while Defendant was insolvent. By June 1999 Defendant had no income and, according to his testimony, had sunk deep in debt from trying to prop up Little Angel in its last days. Defendant filed for bankruptcy about three months after the transfers.

The Court further finds that the conversion of nonexempt mutual funds into exempt homestead equity lends more force to the Court's conclusion that Defendant undertook these transfers with the specific intent to hinder, delay and defraud his creditors and Little Angel's creditors.

The Court finds that Plaintiff carried its initial burden of bringing forward enough evidence to support an inference that Defendant made transfers with the intent to defraud creditors.

The Court further finds that Defendant failed to bring forward sufficient, credible evidence to rebut Plaintiff's prima facie case for denial of discharge. Defendant's testimony was elusive and inconsistent. Defendant failed to produce sufficient documentation for the "loans" whose existence he posed as a defense. Defendant failed to provide alternative, non-fraudulent inferences of intent arising from the evidence.

Therefore, Defendant will be denied his entire discharge pursuant to § 727(a)(2)(A).

## II. EXCEPTION FROM DISCHARGE UNDER § 523(a)(4).

The Court finds it unnecessary to determine whether or not Defendant's debt to Plaintiff should be excepted from discharge as a debt incurred for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The Court denies discharge entirely. It would be illogical to except some particular debt from a nonexistent discharge.

Nevertheless, the Court elects to comment on the unique issues arising in the § 523(a) context due to Plaintiff's inability to assert a particular, direct claim against Defendant. The Court finds that, in the § 523(a) context, representative standing a lá *Barman* and *Davis* is insufficient. Absent some particular, direct claim between a party seeking exception from discharge and a debtor, what is there to be excepted from discharge?

The only method this court sees to establish some particular, direct debt between a third party creditor representative and a fiduciary of a debtor corporation is the trust fund theory. Under this theory, the fiduciaries of a corporation (officers, directors, shareholders) hold the assets of a corporation in trust for a corporation's creditors. *See Ploetner–Christian v. Miceli (In re Miceli)*, 237 B.R. 510, 515 (Bankr.M.D.Fla.1999). If a fiduciary mismanages or loots the company, the fiduciary has committed a breach of trust and is liable to the corporation's creditors collectively. *See id.* Creditors of corporations have attempted to fit this breach of trust debt into the § 523(a)(4) exception from discharge for fraud in a fiduciary capacity with mixed results. *See id.* (finding that, under Florida law, a corporate fiduciary relationship is insufficient for § 523(a)(4) purposes); *but see Miramar Resources, Inc. v. Shultz (In re Shultz)*, 208 B.R. 723 (Bankr.M.D.Fla.1997) (finding that, under Delaware Trust Fund Doctrine, debtor was liable to creditors for defalcation in a fiduciary capacity for § 523(a)(4) purposes). The § 523(a)(4) exception requires a determination as to whether or not a corporate fiduciary holds the assets of a corporation in a "technical trust" for creditors under state law. *See Shultz* at 728. The Court finds that the answer to that

question must be derived by a careful analysis of exactly what qualifies as a "technical trust" under the controlling state law.

The Court therefore leaves the issue of exception from discharge under a corporate fiduciary-trustee theory to any state court before which the parties may bring the issue in the future.

## CONCLUSION

First, the Court finds that Plaintiff has standing to object to Defendant's discharge as a statutory representative of the creditors of Defendant's defunct partnership because of statutory representative claims against Defendant and because the represented creditors hold the vast majority of Defendant's debt to be discharged. Second, the Court denies Defendant discharge for making transfers of estate property within one year of filing for bankruptcy with the intent to defraud creditors pursuant to § 727(a)(2)(A). Finally, the Court finds it unnecessary to address the § 523(a)(4) fiduciary fraud exception to discharge brought by Plaintiff in light of the Court's global denial of discharge.