**In re GREEN, Samuel M., Green, Bonnie J., Debtors.**

**Henkel, Marie E., Plaintiff,**

**v.**

**Green, Samuel M., Green, Bonnie J., Defendants.**

**Henkel, Marie E., Plaintiff,**

**v.**

**Ransom, Lori Green, Green, Samuel M., Green, Bonnie J., Defendants.**

**Bankruptcy No. 99–00703–6J7.**
**Adversary Nos. 99–0086, 00–0058.**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

July 10, 2001.

Garry M. Graber, Buffalo, NY, for Debtor.

Lynnea Concannon, L.S. Concannon, P.A., Orlando, FL, for trustee.

Marie E. Henkel, Orlando, FL, Chapter 7 Trustee.

Peter N.Hill, Wolff, Hill, McFarlin & Herron, PA, Orlando, FL, for Defendants.

Scott W. Spradley, Gray, Harris & Robinson, Orlando, FL, for Defendant.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TRUSTEE'S MOTION FOR TURNOVER OF PROPERTY OF THE ESTATE, TRUSTEE'S OBJECTION TO EXEMPTIONS, AND TRIAL IN ADVERSARY PROCEEDINGS 99–0086 AND 00–0058*

KAREN S. JENNEMANN, Bankruptcy Judge.

This case was heard on March 1, 2, and 14, 2001, on the Motion for Turnover of

Property of the Estate (the "Motion") (Doc. No. 44) and the Objection to Debtors' Claim of Exemptions (the "Objection") (Doc. No. 54) both filed by the Trustee, Marie Henkel (the "Trustee") in the Chapter 7 case of Samuel and Bonnie Green (the "Debtors"). The similar factual and legal issues raised by the Trustee in the Motion and in the Objection were consolidated for trial with all issues raised in two related adversary proceedings also filed by the Trustee:

1. In the Motion, the Trustee seeks the turnover of various financial accounts in the Debtors' control on the date this Chapter 7 bankruptcy case was filed, January 29, 1999. The Debtors did not disclose these accounts, valued at almost $800,000.00, in their initial schedules filed on February 17, 1999. Indeed, the Debtors did not file amended schedules disclosing these accounts until September 8, 2000, almost eighteen months later. The Debtors claimed all of these belatedly scheduled accounts as exempt from claims of creditors.

2. In the Objection, the Trustee asserts that the Debtors are not entitled to exempt the belatedly scheduled accounts because the Debtors deliberately failed to disclose the accounts until over one and one-half years after the initial schedules were filed. The Trustee also objects to all of the Debtors' exemptions alleging, first, that the Debtors claimed the exemptions in bad faith, and, second, that pursuant to Bankruptcy Code Section 522(g),[1] the Debtors are not entitled to exempt property recovered by the Trustee under § 542.[2]

3. In Adversary Proceeding No. 99–86, the Trustee objects to the Debtors' discharge under several subsections of § 727 of the Bankruptcy Code, asserting that the Debtors transferred or concealed property within one year prior to petition, failed to list substantial assets on the petition, failed to explain the dissipation of assets, and withheld records and information from the Trustee.

4. In Adversary Proceeding No. 00–58, the Trustee sued the Debtors and their daughter, Lori Green Ransom ("Ransom"), to recover the following gifts and transfers from the Debtors to Ransom: 1) a $50,000 wedding gift; 2) a 100% interest in the Debtors' corporation, Preventative Medicine Services; and, 3) certain other payments made to Ransom, or on Ransom's behalf, between 1996 and 1998.[3]

---

**1.** Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

**2.** The Trustee also previously objected to certain exemptions claimed by the Debtors on the grounds that: a) the exemptions were claimed under a repealed Florida Statute § 222.06; b) the exemptions claimed under Florida's personal property exemption exceeded the amount of the exemption; c) the assets were purchased or enhanced using non-exempt assets with the intent to hinder, delay, and defraud creditors; and, d) the assets were acquired by fraudulent transfers. Prior to trial, the Debtors conceded that Fla.

Stat. § 222.06 had been repealed and that the exemptions claimed on the Debtors' amended Schedule C exceeded the amount of their personal property exemption. The Trustee conceded that the vast majority of the Debtors' assets were purchased with exempt funds and were not acquired by fraudulent transfers.

**3.** In the same adversary proceeding, the Trustee also alleges that the Debtors made transfers from non-exempt to exempt assets with the intent to hinder, delay, and defraud creditors on several different occasions in the years leading up to bankruptcy. The latter allegations were withdrawn.

The Debtors and Ransom dispute the vast majority of the Trustee's allegations. The Debtors contend that, although their schedules were belatedly amended, they ultimately supplied all requested financial information to their attorneys or to the Trustee. The Debtors maintain that they never attempted to conceal or transfer property away from their creditors or the Trustee and that they have fully explained the dissipation of their assets. An extensive analysis of the facts, beginning many years ago when Dr. Green was· a pilot at Pan American Airways, is necessary to determine which version is supported by the weight of the evidence.

*The Debtors' History.* For many years, the Debtors lived and worked in Florida. Samuel Green was a pilot for National Airlines, later known as Pan American Airways, for seventeen years. During his employment with the airline, Samuel Green accumulated a pension and other retirement related benefits. He made no further contribution to these retirement accounts after he left the airline due to medical problems in 1982.

Instead, Samuel Green pursued his dream to become a medical doctor. He attended medical school and, ultimately, in 1989, started a weight loss and allergy clinic in Vienna, Virginia. The clinic was known as the Green Medical Center (the "Center"). Mrs. Green served as the Center's office manager, and the now Dr. Green treated patients desiring to lose weight. The Debtors' medical practice was extremely lucrative. For the years 1995, 1996, and 1997, the Debtors' adjusted gross income was $1,116,464.00, $1,025,753.00, and $446,668.00, respective-

ly. On their initial schedules, the Debtors listed their combined 1998 income as $45,840.00. The Debtors earned over $2.6 million in the four years preceding this bankruptcy case. Using this very substantial income, the Debtors maintained homes in Florida and Virginia and enjoyed a very nice lifestyle.[4] However, their good fortune soon collapsed.

On December 4, 1996, the FBI raided the Center in connection with an investigation into the Center's questionable insurance billing practices. All records pertaining to the Center's operation were seized. The Debtors also claim, but never demonstrated, that some of their personal financial records were seized. On October 15, 1998, both Debtors were indicted on federal charges of mail and wire fraud for allegedly defrauding several health insurance companies and health care entitlement programs. The Debtors retained two highly respected criminal attorneys, Plato Cacheris and John Hundley, to defend the criminal charges.

The mail and wire fraud charges arose from the Debtors' mischaracterization, or false representation, of patient diagnoses on insurance claim forms. Specifically, the Debtors submitted insurance claim forms diagnosing weight loss patients with illnesses that *were* covered by insurance companies, instead of submitting claim forms with an accurate diagnosis that *was not* covered by insurance. For instance, if a claim form should have indicated a diagnosis of obesity, treatment for which was not covered by insurance, the Debtors filled out claim forms with a diagnosis of

---

**4.** As early as 1996 the Debtors sought advice as to how to best protect their income and assets from the claims of creditors. In a letter dated July 2, 1996, just five months prior to the raid on the Center, the Debtors received legal advice comparing Florida's generous protection of individual retirement accounts to the more limited protection offered in Virginia, and on how to complete an "unchallengeable" change of domicile from Virginia to Florida. (Trustee's Exhibit No. 28).

"malaise and fatigue" or some other illness that was covered by insurance.

The Center remained open at its Vienna location for a limited time following the raid. Eventually, the clinic moved to Falls Church, Virginia, and began operating under the name of Preventive Medicine Services ("PMS"). (Debtors' Exhibit No. 14, p. 2). In March, 1998, PMS closed, and the Debtors transferred their interest in PMS to their daughter, Ransom.

After closing the clinic in March, 1998, the Debtors hoped to open a similar medical center in Kuwait in partnership with an entity called Sports and Health International Institute of Kuwait ("SHIIK"). On April 26, 1998, the Debtors entered into an agreement (the "Agreement") with SHIIK which provided, in part, that the Debtors would receive monthly salaries aggregating approximately $25,000. (Debtors' Exhibit 14, p. 3). After the Debtors were indicted in October, 1998, however, Dr. Green experienced health problems, and the Debtors were unable to fulfill their obligations under the Agreement. The SHIIK operation failed. At trial, Mrs. Green testified that, despite the SHIIK business failure, she continues to do business in Kuwait and currently acts as a nutritional advisor at a counseling center she operates in Kuwait.

At the same time the Debtors started traveling back and forth to Kuwait in Spring 1998, they stopped paying all of their creditors in the United States. They leased their home in Virginia and kept the rental income but did not pay the underlying mortgage. By mid-summer 1998, the Debtors had stopped paying debts associated with their Florida home, their cars, and other unsecured debt. The Debtors lost the Virginia home to foreclosure in October 1998. They lost their Florida home to foreclosure in February 1999. (Trustee's Exhibit Nos. 16 & 17). Howev-er, the Debtors did find $50,000.00 to give Ransom and her new husband as a wedding present in May 1998. (Ransom's Exhibit No. 1).

On March 11, 1999, Dr. Green alone pled guilty to criminal charges of conspiracy to commit mail and wire fraud in connection with his operation of the Center from 1992 through 1996. (Trustee's Exhibit No. 15). The plea agreement provided, in part, that all counts against Mrs. Green would be dropped and that Dr. Green would make restitution to the defrauded insurance companies. On June 18, 1999, a separate Restitution Judgment was entered against Dr. Green, ordering him to pay $1,423,944.00 to approximately twenty-one private insurance companies and federal insurance entitlement programs (the "Restitution Creditors"). (Trustee's Exhibit No. 15). Dr. Green was sentenced to serve over three years in a federal penitentiary.

Because of Dr. Green's incarceration, the trial in this case was set at a distant future date to give the Debtors time to request transport of Dr. Green to testify at the trial. Apparently, no attempt was made by the Debtors to obtain Dr. Green's attendance at the trial. Dr. Green did not testify, and the Court never learned his version of the events.

*The Bankruptcy.* On January 29, 1999, the Debtors filed this Chapter 7 bankruptcy case with the assistance of two attorneys, Michael Duggar ("Duggar") and Neil Buchalter ("Buchalter"). Despite substantial income exceeding $2.6 million earned in the prior four years, the Debtors valued their unencumbered personal property at only $14,025.00, a disparity that did not escape the Trustee's attention. (Trustee's Exhibit No. 1). The Trustee testified that, after totaling up the personal property initially disclosed by the Debtors, calculating the Debtors' personal property exemp-

tions, and selling all of the non-exempt property, only approximately twelve thousand dollars remained for distribution to creditors. Significantly, the Debtors' initial bankruptcy schedules listed only two checking accounts, both with zero balances, and listed *no* life insurance policies, individual retirement accounts, or pension accounts. (Trustee's Exhibit No. 1).

The Debtors admit that their initial schedules were inaccurate. In fact, the Debtors later acknowledged interests in several financial accounts and annuities totaling almost $800,000.00. At one point during Mrs. Green's testimony during the trial, she claimed she listed all of the omitted accounts on the pre-petition worksheets filled out by the Debtors and submitted to Duggar's staff. (*See also* Adversary Proceeding No. 99–86, Doc. No. 4). Mrs. Green blamed Duggar's staff for omitting the listed assets from the Debtors' original schedules when Duggar's staff transferred the information from the worksheets to the schedules. Mrs. Green further maintained that she and Dr. Green were unaware of the error because, due to their significant travel between Virginia, Florida, and Kuwait, Dr. Green's health concerns, and the heavy demands caused by the criminal charges, Buchalter suggested that they sign blank schedules in order to save time. In other words, Mrs. Green testified that neither she nor Dr. Green ever saw their completed initial schedules before they signed the schedules, and that she relied on their attorneys to transfer the financial information from their pre-petition worksheets to their schedules prior to filing.

The Court does not find Mrs. Green's testimony credible. The Debtors did produce correspondence from Duggar to the Trustee's attorney indicating that certain limited information regarding the Debtors' life insurance policies and individual retire-

ment accounts inadvertently was omitted from the Debtors' initial schedules. (Debtors' Exhibit No. 8). However, neither Duggar nor Buchalter testified at trial in support of the Debtors' version of the events. No copy of the alleged detailed worksheet supplied by Mrs. Green to her attorneys was introduced. Moreover, the initial schedules appear to have been created by computer software such that they had to be completed in final form to generate a signature line at the end of the document for the Debtors to sign. In addition, at the meeting of creditors, held on March 9, 1999, Dr. Green testified that he *did* read the schedules prior to signing them. (Debtors' Exhibit No. 1, p. 3). Therefore, the Court specifically finds that both Debtors read and reviewed the completed schedules prior to their filing on February 17, 1999. Although the Debtors' attorneys indeed inadvertently may have omitted some information on the Debtors' financial accounts in the original schedules, the Debtors read and should have known of the error at the time they signed the schedules. The Court further finds that the Debtors never provided complete financial information to their attorneys before the initial schedules were prepared. At best, the Debtors gave their attorneys inaccurate and incomplete information on their true financial condition.

The Debtors also blame their lawyers for failing to keep them informed about events happening in the case. On February 22, 1999, the day prior to the first scheduled meeting of creditors, the Trustee faxed a letter to the Debtors' counsel requesting that the Debtors bring certain records and documents to the meeting. (Trustee's Exhibit No. 21). The Debtors contend they never received this request from their counsel. The Debtors also failed to appear at the creditors' meeting and claimed they were never informed of the date. Due to the Debtors' absence,

the Trustee continued the meeting to March 9, 1999. On February 25, 1999, Duggar faxed a copy of the Trustee's document request to the Debtors in Virginia. The Debtors claimed they did not receive this fax.

Again, the Court did not find Mrs. Green's testimony credible. She should have received notice of the creditors' meeting directly from the Court, not her attorney. Moreover, the Court finds that her attorney sent the Trustee's production request to her and called regarding the creditors meeting in a timely fashion. Dr. and Mrs. Green simply, and perhaps understandably, were focusing on the criminal charges, not the bankruptcy.

The Debtors did attend the rescheduled creditors' meeting with Duggar on March 9, 1999. The Debtors did not bring the records and documents previously requested by the Trustee. At trial, Mrs. Green admitted that, after the creditors' meeting on March 9, she knew the schedules needed to be amended.

The Trustee, unsatisfied with the amount of financial information gleaned from the Debtors' testimony at the creditors' meeting and frustrated by the lack of document production, filed a motion for a 2004 examination[5] of the Debtors, again requesting that the Debtors produce certain records and documents. The Trustee scheduled the examination for April 16, 1999. Thus, the Debtors had over one month to compile the documents and records requested by the Trustee.

The Debtors, again represented by Duggar, appeared at the 2004 examination. They brought a number of uncompiled, miscellaneous records but certainly did not produce all or even most of the records requested by the Trustee. The Debtors failed to include a significant amount of information regarding their individual retirement accounts ("IRAs"), annuities, and life insurance policies, and provided only sparse or incomplete bank statements. During the 2004 examination, the Debtors agreed to render a complete document production to the Trustee by May 15, 1999. (Debtors' Exhibit No. 2, p. 85). They also suggested that the Trustee talk to their financial advisor, Mr. Edward Harris.

Due to the Debtors' lack of production and continuing failure to amend their schedules, on April 19, 1999, the Trustee filed an adversary proceeding objecting to the Debtors' discharge on many grounds. Only *after* the Trustee filed the adversary proceeding did the Debtors partially comply with the Trustee's request for production, and, on or by May 11, 1999, the Debtors provided additional documentation to the Trustee. (Trustee's Exhibit No. 23). However, despite the fact that the Debtors admittedly knew, by March 9, at the latest, that their bankruptcy schedules needed to be amended, the Debtors did not amend their schedules until September 8, 2000,[6] eighteen months after this bankruptcy case was filed.

When the Debtors finally did amend their schedules, they listed five bank ac-

---

**5.** Federal Rule of Bankruptcy Procedure 2004 allows a party in interest, upon court approval, to examine any entity on any matter that may affect the administration of the debtor's estate.

**6.** On February 23, 2000, the Debtors filed a motion requesting that attorneys from the Buffalo, New York, office of the law firm Hodgson, Russ, Andrews, Woods & Goodyear

("Hodgson Russ") be substituted as counsel in place of withdrawing counsel Buchalter and Duggar. (Case 99–0086, Doc. No. 12). In May, 2000, attorney Peter N. Hill of Wolff, Hill, McFarlin & Herron, P.A., was retained by the Debtors as their local counsel. Even after the substitution of counsel, however, the Debtors' schedules were not readily amended.

counts, three insurance policies, one annuity, and nine IRA accounts. None of these assets were listed on the initial schedules, with the exception that the monthly income of $730.00 earned on the annuity was listed as "pension or retirement income" on the Debtors' original Schedule I. More importantly, the Debtors, for the first time, claimed all of these newly scheduled assets, valued at $792,966.00, as exempt from claims of creditors. Specifically, the Debtors claimed the following assets as exempt for the first time in the amended schedules filed on September 8, 2000:

| Asset | Market Value | Exemption Claimed | Exemption Value |
|---|---|---|---|
| Interests in Checking, Savings, or Other Financial Accounts, Certificates of Deposit | | | |
| T. Rowe Price Account No. 520091946–2 | $ 91.64 | FSA § 222.21(2) | $ 91.64 |
| Scotia Bank Checking Account No. 350931 (Value as of May 15, 1998) | $ 3,102.41 | Art.10, § 4(a)(2), FSA § 222.06 | $ 1,000.00 |
| Lloyds Bank Checking Account No. 0698817 | $ 3,181.07 | Art.10, § 4(a)(2), FSA § 222.06 | $ 1,000.00 |
| Pan Am Horizons Federal Credit Union Checking Account No. 404522 | $ 1,876.69 | Art.10, § 4(a)(2), FSA § 222.06 | $ 1,000.00 |
| F & M Bank of Northern Virginia Checking Account No. 1322044 | $ 0.00 | Art.10, § 4(a)(2), FSA § 222.06 | $ 0.00 |
| Interests in Insurance Policies | | | |
| Old Line Life Policy No. 5 1971731L Policy No. 5 1971731L | $ 9,192.37 | FSA § 222.14 | $ 9,192.37 |
| Hartford Life Policy No. LL6019592 | $ 69,620.21 | FSA § 222.14 | $ 69,620.21 |
| Jackson National Life Policy No. 0022652360 | $ 5,000.00 | FSA § 222.14 | $ 5,000.00 |
| Annuities | | | |
| Prudential Annuity Contract # 005233 | $ 713.15 | FSA § 222.14 | $ 713.15 |
| Interests in Individual Retirement Accounts | | | |
| Jackson National Life Insurance IRA Account No. 36748810 | $141,786.90 | FSA § 222.21(2) | $141,786.90 |
| Jackson National Life Insurance IRA Account No. 35530030 | $ 42,707.97 | FSA § 222.21(2) | $ 42,707.97 |
| Jackson National Life Insurance IRA Account No. 36735960 | $ 47,832.24 | FSA § 222.21(2) | $ 47,832.24 |
| Canada Life Assurance Company | $202,228.54 | FSA § 222.21(2) | $202,228.54 |

IRA Account No. B403930

| | | | |
|---|---|---|---|
| All America Financial IRA Account No. VQ402154 | $201,887.96 | FSA § 222.21(2) | $201,887.96 |
| Smith–Barney IRA Account No. 179–44369–13 130 | $ 22,096.78 | FSA § 222.21(2) | $ 22,096.78 |
| Smith Barney IRA Account No. 179–44368–14–130 | $ 12,921.71 | FSA § 222.21(2) | $ 12,921.71 |
| T. Rowe Price IRA Account No. 520157494–5 | $ 2,436.77 | FSA § 222.21(2) | $ 2,436.77 |
| T. Rowe Price IRA Account No. 520157490–3 | $ 25,576.44 | FSA § 222.21(2) | $ 25,576.44 |

(Trustee's Exhibit No. 26, pps. 7–8).

At trial, the parties stipulated that most of the newly scheduled assets were funded with monies rolled over from Dr. Green's Pan American pension and other related retirement benefits. In 1991, Pan American terminated all of its employee benefit plans, including Dr. Green's. During 1992 and 1993, Dr. Green, with the help of his financial advisor, Mr. Harris, set up the various IRA and annuity accounts listed on the Debtors' amended schedules. The Debtors made no further financial contributions to these accounts so that all returns invested in them are attributable to Dr. Green's employment with Pan American many years ago. The Trustee concedes that all of the Debtors' IRAs were funded by the Pan American pension rollover except one, the T. Rowe Price Account No. 520157494–5 in the amount of $2,436.77. The Trustee also concedes that the Debtors' annuity contract with Prudential was funded by the Pan American pension.

The Debtors further have stipulated that four of their five checking accounts, those located at Scotia Bank, Lloyds Bank, Pan Am Horizons Federal Credit Union, and F & M Bank of Northern Virginia, do not qualify as exempt. As to the Debtors' fifth checking account, the T. Rowe Price account 520091946–2, just three weeks prior to this case, on January 7, 1999, the Debtors withdrew $2,400.00 from that account. The Trustee traced these funds into a business checking account the Debtors refer to as the "Bonmi" account, opened at Skylake State Bank on February 16, 1999, shortly after the bankruptcy was filed. (Trustee's Exhibit 25, pps. 1–7.)

The Bonmi account was opened under very suspicious circumstances. Ed Harris opened the account for the Debtors. The name of the account is a combination of the Debtors' names—Bonnie and Samuel Michael. Yet, although the account is listed as a "sole proprietor" account, neither Debtor used their own individual social security number, as they should have. Rather, Mr. Harris requested a *new* taxpayer identification number for the account. When combined with the fact that the Debtors opened the account with an undisclosed asset and did not disclose the transfer/account to the Trustee for many months later, it appears as if the Debtors made an orchestrated attempt to hide this asset from the Trustee. Specifically, the Debtors got a check for $2,400.00 prior to filing this bankruptcy, held the check until

the bankruptcy was filed, opened a new account without using either Debtors' tax identification number, and failed to disclose any of this to the Trustee. The Court notes the Debtors were taking these apparently deliberate actions at the same time they profess they were so distracted by the criminal charges that they could not concentrate on the bankruptcy. The Court also notes that the funds used by the Debtors to open the Bonmi account were not exempt from creditor claims.

As to the remaining accounts, Mr. Harris' testimony indicates that two of the Debtors' life insurance policies, Old Line Life, issued November 17, 1993, and Jackson National Life, issued October 27, 1993, lapsed due to nonpayment of premiums at some point after the Debtors filed bankruptcy. The third life insurance policy, Hartford Life, was issued for Mrs. Green on October 26, 1994, and premium payments on that policy appear to have been made from the policy's inception through 1996. On at least one occasion, the Debtors withdrew funds from the Hartford Life policy to pay for legal representation in the federal criminal case.

In summary, the Debtors' amended schedules reflected: (i) three life insurance policies, two of which lapsed after the bankruptcy case was filed but before the amended schedules were filed; (ii) four checking accounts containing *de minimus* sums that the Debtors do not claim as exempt; (iii) one non-exempt bank account, the T. Rowe Price account, that the Debtors depleted shortly before the bankruptcy was filed and used to open the suspicious Bonmi account; (iv) one annuity and eight IRA accounts that were funded by Dr. Green's benefits earned during his tenure at Pan American; and, (v) one IRA account, the T. Rowe Price Account No.

520157494–5, which the Debtors directly funded.

The Debtors assert that the Trustee had information on these accounts as early as the Trustee's examination of the Debtors on April 16, 1999. Certainly, the Debtors gave the Trustee testimony and documents in dribs and drabs about this, that, or the other account as they saw fit beginning on April 16, 1999. Moreover, Mr. Harris, in the end, provided valuable information about the Debtors' financial holdings. However, the Debtors *never* provided a coherent financial picture until September 2000. By that time, the Trustee estimates she had incurred almost $47,000.00 in legal and investigation costs. None of this cost would have been necessary if the Debtors had originally filed complete and accurate schedules.

Moreover, the amended, belated schedules as filed remain inadequate due to a number of glaring omissions. The most significant omission is the Debtors' utter failure to explain how their income in the four years preceding the bankruptcy could exceed $2.6 million, yet they had non-exempt assets valued at only $14,025.00. The vast majority of the belatedly disclosed assets originated with Dr. Green's Pan American retirement benefits in existence since 1993. If the Debtors obtained nothing of value since 1993, where did all the money go? A general disclaimer that the Debtors used the monies for "living expenses" will not suffice.

In addition, the amended schedules failed to list the Restitution Creditors, yet the Debtors had a liquidated Restitution Judgment dated June 18, 1999, that listed each and every creditor. The Debtors also omitted numerous significant transfers: (i) a withdrawal of funds totaling $150,632.24 from an annuity on April 15, 1998;[7] (ii) a withdrawal of funds totaling $91,166.39

---

7. (Trustee's Exhibit 1, p. 27, Trustee's Exhibit No. 26, p. 15, Lincoln Benefit Life Company,

from an IRA on June 25, 1998;[8] (iii) at least one withdrawal from an IRA on March 1, 1999, in the amount of $50,000.00;[9] and (iv) several withdrawals and subsequent transfers to Plato Cacheris between September 15, 1997, and October 23, 1998, totaling approximately $275,303.00.[10] (Defendants' Exhibit M). Each of these extraordinary and significant transfers would remain undisclosed on the Debtors' schedules. It is important to note that all of these undisclosed transfers, both pre- and post-petition, depleted the various financial accounts claimed as exempt that were not scheduled by the Debtors until September 2000.

Moreover, at least an additional $100,000.00 was withdrawn from these belatedly scheduled accounts and used by the Debtors for some unknown purpose. The Trustee, after much prodding and legal expense, ultimately documented the transfers out of these accounts. The Trustee also could trace the recipients of *some* of these transfers, as just discussed. However, the Debtors utterly failed to account for *at least* $100,000.00 of the withdrawn funds.

The following timeline helps illuminate the Debtors' actions:

| Date | Event/Transaction |
|---|---|
| December 4, 1996 | FBI raid on Green Medical Center; FBI seizes Business property and records. |
| March, 1998 | Green Medical Center/PMS closes. |
| May, 1998 | Debtors stop making payments to secured creditors on two homes, a car, and other unsecured debt. |
| May 28, 1998 | Debtors give wedding gift of $50,000.00 to their daughter. |
| June, 1998 | Debtors terminate All American Investment IRA and receive payment of $91,166.39. |
| July 20, 1998 | Debtors make another withdrawal of $95,000.00 from Hartford Life Insurance Policy. |
| August, 1998 | Debtors travel to Kuwait. |
| October 15, 1998 | Both Debtors are federally indicted. |
| January 7, 1999 | Debtors withdraw $2,400.00 from T. Rowe Price Bank account. |
| January 29, 1999 | Debtors file a Bankruptcy petition. |
| February 16, 1999 | Debtors open Bonmi account using property of the estate. |
| February 17, 1999 | Debtors file initial schedules. |

Annuity Contract No. 01–F0100195).

**8.** (Trustee's Exhibit 1, p. 27, Trustee's Exhibit No. 26, p. 15, All America Investment, Inc., IRA Contract No. VQ402154).

**9.** (Trustee's Exhibit No. 26, p. 9, Jackson National Life Insurance Company).

**10.** At least $95,000 of these funds were withdrawn from Mrs. Green's life insurance policy with Hartford Life Insurance Company on July 20, 1998. (Trustee's Exhibit 14, p. 9).

February 22, 1999 Chapter 7 Trustee requests additional financial information.

February 23, 1999 First meeting of creditors is held; Debtors' attorney attends; Debtors do not.

March 9, 1999 Second meeting of creditors is held; Debtors attend but do not bring the financial information requested by the Trustee. Debtors disclose general information on previously undisclosed assets valuing the assets at $430,000.00 and disclose general information on transfers exceeding $150,000.00 occurring within the year before the bankruptcy. Debtors also disclose that $210,000.00 was transferred to Plato Cacheris. Debtors agreed to supply additional documents.

March 10, 1999 Dr. Green signs plea agreement.

April 16, 1999 2004 examination; Debtors brought some, not all, of the documents requested by the Trustee.

April 19, 1999 Trustee files Adversary Proceeding No. 99–86 objecting to discharge.

May 11, 1999 Debtors begin to provide additional information to the Trustee in a piecemeal fashion.

May 15, 1999 Deadline for Debtors to produce the financial information requested by the Trustee passes without the Debtors fully supplying the requested information or filing amended schedules.

June 18, 1999 Restitution Judgment for $1,423,944.00 is entered; Dr. Green is incarcerated.

February 22, 2000 Debtors hire new counsel.

September 8, 2000 Debtors belatedly amend schedules and statement of financial affairs.

---

As a result of these cumulative actions by the Debtors, the Trustee objects to the Debtors receiving a discharge, seeks to avoid transfers to the Debtors' daughter, objects to the Debtors' claim of exempt property, and seeks the turnover of property currently frozen pursuant to a preliminary injunction.[11]

■ *Adversary Proceeding 99–86: Objection to Debtors' Discharge.* The Bankruptcy Code's primary purpose is to

11. In adversary proceeding 00–58, on May 15, 2000, the Trustee filed a Motion alleging sufficient facts, supported by an affidavit, to demonstrate that the bankruptcy estate would be immediately and irreparably harmed if the Court did not restrict the Debtors' access to assets named in the Motion. Mrs. Green was living and working in Kuwait, and the Trustee was concerned the Debtors would continue to dissipate the partially identified but still unscheduled assets. The assets referenced in the Motion and subject to the injunction were the same assets that the Debtors failed to list on their initial schedules, some of which the Debtors had either closed or significantly depleted within one year prior to petition or just shortly after filing bankruptcy. The Court entered an order granting an injunction and freezing these accounts (Doc. No. 12, Adversary Proceeding No. 00–58). The Debtors agreed to the continuation of the injunction pending the resolution of all issues raised in 00–58.

provide honest debtors a fresh start. Accordingly, objections to discharge are construed strictly against the plaintiff and liberally in favor of the debtor. *Kalvin v. Clawson (In re Clawson)*, 119 B.R. 851, 852 (Bankr.M.D.Fla.1990). The burden in all actions under Section 727 of the Bankruptcy Code is upon the plaintiff, here the Trustee, to prove its allegations by a preponderance of the evidence. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992) (*citing Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); Fed. R. Bankr.P. 4005 (2001). Once the initial burden of producing evidence establishing the basis for the objection is met, the burden shifts to the debtor. *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984). The debtor then brings forth "enough credible evidence to dissuade the court from exercising its discretion to deny the debtor [a] discharge based on the evidence presented by the objecting party." *In re Prevatt*, 261 B.R. 54, 58 (Bankr.M.D.Fla. 2000).

In this case, the Trustee has asserted that the Debtors' conduct meets the requirements for denial of discharge under sections § 727(a)(2)(A) and (B), § 727(a)(3), § 727(a)(4)(A) and (D), and § 727(a)(5). The relevant portions of § 727 provide as follows:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a)(2)(A) & (B); § 727(a)(3); § 727(a)(4)(A) & (D); § 727(a)(5).

 *Denial of Discharge under § 727(a)(2)(A) and (B).* Under § 727(a)(2)(B), the party objecting to discharge is required to show that the debtor concealed property of the estate after the date the bankruptcy petition was filed. *Phillips v. Nipper (In re Nipper)*, 186 B.R. 284, 288 (Bankr.M.D.Fla.1995) (*citation omitted*). Under § 727(a)(2)(A), the party objecting to a debtor's discharge must

prove, by a preponderance of the evidence, that: (1) a transfer occurred; (2) the transfer was of the debtor's property; (3) the transfer was within one year of the petition; and (4) the transfer was performed with the intent to hinder, delay, or defraud a creditor or the trustee. *In re Strasnick* 256 B.R. 330, 337–38 (Bankr. M.D.Fla.2000) (*citations omitted*). In determining whether or not a debtor had fraudulent intent regarding the transfer, courts can consider the debtor's actions and circumstantial evidence, including the traditional "badges of fraud." *Id.* at 338 (*citations omitted*). Badges of fraud are strong indicators of fraudulent intent and include: (1) lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) retention of possession for use and benefit; (4) financial condition of the transferor before and after the transfer; (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit; and (6) general chronology and timing of events. *See id. citing Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121–22 (M.D.Fla. 1991).

█ The Trustee has proven that the Debtors concealed property and transfers of the Debtors' property both before and after this case was filed. The Debtors failed to disclose substantial transfers to their criminal attorneys within one year prior to filing this case. The Debtors' initial schedules failed to disclose their interest in approximately $800,000.00 worth of property. The Debtors continued to effectively conceal this property from the Trustee for months by failing to file necessary amended schedules.

Throughout this case, the Debtors have not voluntarily provided complete financial information to the Trustee. The Debtors provided partial responses to the Trustee's multiple document requests and questions only after the Trustee filed an adversary proceeding objecting to the Debtors' discharge. If the Trustee had not asked the right questions regarding the Debtors' assets, the Debtors' assets would remain concealed to this date, to the extent the assets are even now disclosed.

The Debtors have maintained that their concealment and failure to timely amend their schedules was because they were busy defending the criminal charges against them and because they were traveling between residences. This excuse simply will not do. In every bankruptcy case the trustee must have ready access to information regarding a debtor's financial situation in order to determine how best to proceed with the administration of the estate. The Trustee needs the information at the beginning of the case, not eighteen months later. The Trustee is not required to spend extraordinary efforts to locate the assets, as the Trustee in this case was required to do.

Here, the Debtors went to great efforts to conceal information regarding transfers of their assets and their financial accounts after the petition was filed. Yet, at the same time the Debtors were hiding their assets from the Trustee, they were opening a suspicious bank account in a fictional name, Bonmi, using nonexempt funds. The Court does not find it credible that the Debtors could orchestrate some financial transactions, such as opening the Bonmi account, but be allegedly frozen in their efforts to cooperate with the Trustee for month after month due to their other troubles. Accordingly, the Court concludes that, based on the cumulative effect of the Debtors' transactions and course of conduct after the onset of financial difficulties and the general chronology and timing of events, the Debtors, with the intent to hinder and delay the Trustee, an officer of

the estate charged with custody of the Debtors' property, transferred and concealed property within one year prior to the filing of this case and property of the estate after the date the case was filed. The Debtors' discharge is denied under § 727(a)(2)(A) and (B).

▇▇▇ *Denial of Discharge under § 727(a)(3).* Under § 727(a)(3), the Trustee has the initial burden to show reasonable grounds to believe that the Debtors' books or records are inadequate. *In re Nipper,* 186 B.R. 284, 289 (Bankr.M.D.Fla. 1995)` (*citing In re Milam,* 172 B.R. 371 (Bankr.M.D.Fla.1994) *citing In re Goff,* 495 F.2d 199 (5th Cir.1974)). A full accounting of every business transaction is not required; however, a debtor should maintain "some written records from which [the debtor's] present and past financial condition .... may be ascertained. with substantial completeness and accuracy." *In re Nipper* 186 B.R. at 289 (*citations omitted*). A less stringent standard may be applied to a debtor who is not engaged in business than to a debtor who is engaged in business, nevertheless, each case must be determined on its own facts. *In re Milam,* 172 B.R. at 375 (*citing In re More,* 138 B.R. 102, 105 (Bankr.M.D.Fla. 1992)).

▇▇▇ The Debtors ran a large scale medical practice earning $2.6 million in the four years preceding the bankruptcy. The practice closed only months before the filing. Yet, the Debtors profess to own *no* assets purchased with this income. Nor have the Debtors supplied any financial records that credibly account for the use of these funds. Indeed, the Trustee received no checking records from the Debtors after July 1998, a significant six month gap directly preceding the bankruptcy. In addition, the Trustee demonstrated transfers exceeding $100,000.00 from the late-scheduled financial accounts. The Debtors failed to account for the use of these funds, other than to say the monies were used to pay "living expenses." Although a full accounting is not required by every consumer debtor, here, the Debtors have fallen woefully short in maintaining adequate books and records. The Court suspects that the Debtors intentionally concealed or destroyed the records, but, regardless of intent, the Court finds the Debtors failed to keep or preserve sufficient financial records from which the Debtors' financial condition can be ascertained. Therefore, the Debtors' discharge will be denied under § 727(a)(3).

▇▇▇ *Denial of Discharge under § 727(a)(4)(A) and (D).* An omission from a debtor's schedules, which are signed under penalty of perjury, may constitute a false oath. *In re Chalik,* 748 F.2d 616, 618, n. 3 (11th Cir.1984) (*citing Farmers Co–Operative Assn. v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982)). Where a debtor knowingly and fraudulently makes a false oath, courts can deny a debtor's discharge. *In re Chalik,* 748 F.2d at 618 (*citing In re Raiford,* 695 F.2d 521, 522 (11th Cir.1983)). A debtor's "reckless indifference to the truth .... has consistently been treated as the functional equivalent of fraud" for the purposes of denying a discharge. *In re Grondin,* 232 B.R. 274, 277–78 (1st Cir. BAP 1999) (*quoting Boroff v. Tully (In re Tully),* 818 F.2d 106, 112 (1st Cir.1987) *citing Diorio v. Kreisler–Borg Construction Co. (In re Diorio),* 407 F.2d 1330, 1331 (2d Cir.1969) (per curiam)). In *Hatton v. Spencer (In re Hatton),* 204 B.R. 477 (E.D.Va.1997), the District Court for the Eastern District of Virginia provides a thoughtful analysis of the § 727(a)(4)(A) inquiry:

> The purpose of a section 727(a)(4)(A) inquiry is to prohibit a discharge "for those who play fast and loose with their assets or with the reality of their af-

fairs." [12] The statute thus maintains the integrity of the bankruptcy process by insuring that neither the trustee nor the creditors needs "to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." [13] The requirement that complete, truthful, and reliable information be presented at the outset of the proceeding thus has two beneficial effects. [14] Subsequent decisions can be based on fact rather than fiction, and creditors and trustees can husband their resources more effectively. [15]

*In re Hatton*, 204 B.R. 477, 482–83 (E.D.Va.1997).

Denial of a discharge is appropriate if the omission is fraudulent and material. *In re Chalik*, 748 F.2d at 618. A material omission, sufficient to bar discharge, is one that "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Id.* The party objecting to discharge has the burden of producing sufficient evidence to "give rise to a reasonable inference that the debtor failed to disclose information with the intent to hinder the investigation of the trustee and creditors." *In re Prevatt*, 261 B.R. at 59 (*citing In re Chalik*, 748 F.2d at 619). This burden then shifts to the debtor to overcome the inference with credible evidence. *See id.* Whether the debtor had specific intent to harm a particular creditor or whether the undisclosed assets were worthless is irrelevant. *See id.* (*citing In re Chalik*, 748 F.2d at 618).

The veracity of a debtor's statements on his schedules is paramount in bankruptcy. *In re Chalik*, 748 F.2d at 618; *In re Milam*, 172 B.R. at 375. Subsequent amendments to a debtor's schedules may or may not cure an earlier omission, depending on the circumstances of the case. *See In re Ingle*, 70 B.R. 979, 984 (Bankr.E.D.N.C.1987) (including property in an amended petition does not excuse omission of that same property on the original petition where debtor offers no explanation for the initial omission); *See also In re Shebel*, 54 B.R. 199, 203 (Bankr. D.Vt.1985); *In re Ailetcher*, 49 B.R. 681 (Bankr.D.Haw.1985); *In re George*, 9 B.R. 9, 10 (Bankr.S.D.Fla.1981); *but see In re Johnson*, 139 B.R. 163, 170 (Bankr.E.D.Va. 1992) (a debtor's subsequent amendment of his schedules may mitigate an appearance of fraudulent intent "if the later disclosure is voluntary, and not in response to the fear of discovery.") Even where schedules were prepared in haste, a debtor's failure to promptly amend the schedules to include omitted property can be considered reckless indifference to the truth and is tantamount to fraud. *In re Nazarian*, 18 B.R. 143, 147 (Bankr.D.Md. 1982).

This case presents a textbook illustration of when a discharge should be denied pursuant to § 727(a)(4)(A) and (D). The Debtors' initial schedules omitted approximately $792,966.00 worth of property. The Debtors also failed to disclose transfers of estate property exceeding $300,000.00.

The Debtors blame these omissions on the fact that, in their haste to file a peti-

---

**12.** *Citing Farouki v. Emirates Bank Int'l., Ltd.,* 14 F.3d 244, 249 (4th Cir.1994) (*quoting In re Tully,* 818 F.2d at 110).

**13.** *Quoting In re Tully,* 818 F.2d at 110.

**14.** *Internal quotations omitted.*

**15.** *Citing In re Tully,* 818 F.2d 106, 110 (1st Cir.1987); *In re Farouki,* 133 B.R. 769, 782 (Bankr.E.D.Va.1991); *In re Ingle,* 70 B.R. 979, 983 (Bankr.E.D.N.C.1987).

tion, they signed blank schedules, relying solely on their attorneys to transfer information from their pre-petition worksheets to their schedules. The Debtors have maintained that they *did* include all the information omitted from their schedules on their pre-petition worksheets, and Mrs. Green testified that the Debtors never actually saw the final version of the initial schedules. The Debtors have argued that one of the primary reasons for the delay in filing amended schedules is because their personal financial documents were seized in the FBI raid on December 4, 1996.

First, the Court did not find Mrs. Green's testimony or her story credible. Second, the Debtors' version of the events is internally inconsistent. The Debtors would have the Court believe that they: 1) disclosed all financial information on their pre-petition worksheets completed and given to their attorneys in November 1998; and, 2) could not supply amended schedules and full financial information prior to September 8, 2000, because the records they needed were seized in the FBI raid. The excuse the Debtors provide for their untimely filed amended schedules is irreconcilable with their excuse for the lack of disclosure on their initial schedules. If the Debtors had the financial information readily available when they filled out their pre-petition worksheets, then they would have had the same information available to them at all times subsequent. The Debtors cannot expect the Court to find both that the Debtors were forthcoming on their pre-petition worksheets and that they were later unable to comply with the Trustee's document requests or timely amend their schedules because their financial records were seized two years before the bankruptcy.

Rather, the Court finds that the Debtors knowingly and fraudulently completed their initial schedules omitting numerous valuable assets. The omissions were material and forced the Trustee "to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *In re Hatton*, 204 B.R. at 482–83. The Trustee made at least four separate requests for specific financial records. The Debtors repeatedly failed to fulfill this request, resulting in a significant delay and additional expense in the administration of the estate. In every bankruptcy case, the debtor's cooperation with the Trustee is essential to an orderly administration of the estate. Here, the Debtors' ongoing recalcitrance cannot be rewarded with a discharge. The Debtors knowingly made a false oath by omitting any mention of their IRAs, checking accounts and life insurance policies when they signed their bankruptcy schedules. *See In re Chalik*, 748 F.2d at 618, n. 3. Therefore, the Debtors' discharge is denied under § 727(a)(4)(A).

■■■ *Denial of Discharge under § 727(a)(5).* Under § 727(a)(5), the party objecting to discharge has the initial burden of showing why, or how, a debtor has failed to explain a loss of assets.[16] *In re Chalik*, 748 F.2d at 619. If the objecting party produces enough evidence to meet this burden and to establish the basis for the objection, the burden shifts to the debtor to explain satisfactorily any loss of assets. *Id.* at 619. A satisfactory explanation is one that convinces the judge. *Id.* (*citations omitted*). Vague and indefinite explanations will not suffice. *Id.* (*citing In re Reed*, 700 F.2d 986, 993 (5th Cir.1983)).

■■■ Here, the Debtors had significant income in the four years prior to bankrupt-

---

16. However, a "creditor's burden of persuasion does not obviate the necessity that the debtor provide a satisfactory explanation of the loss of his assets." *In re Chalik*, 748 F.2d at 619 (*quoting In re Reed*, 700 F.2d 986, 992–93 (5th Cir.1983)).

cy. However, the Debtors' amended schedules reveal relatively few unencumbered assets. As discussed above, the Debtors supplied no credible explanation for where their income went. The Debtors provided only vague, indefinite, or incomplete explanations for their overall loss of and lack of assets. Even after the Debtors amended their schedules, the Trustee cannot track the Debtors' financial dealings or determine how the Debtors spent their large cumulative income for the years 1995, 1996, and 1997. The Trustee further cannot trace the use of $100,000.00 withdrawn around the time the bankruptcy was filed. Clearly, the Debtors incurred expenses defending against the federal criminal action. The Debtors also may have invested money in the failed SHIIK venture, although the total amount of the Debtors' investment is uncertain. The Trustee produced more than enough evidence to shift the burden to the Debtors to explain their lack of assets. The Debtors did not satisfactorily convince this Court of the reasons for their loss of assets. Indeed, the Debtors did not even make any credible effort to explain the loss of assets. Therefore, the Debtors' discharge is denied under § 727(a)(5).

■ *Adversary Proceeding 00–58: Fraudulent Conveyances.* In adversary proceeding 00–58, the Trustee alleges that certain transfers the Debtors made to their daughter, Ransom, amount to either actual or constructive fraud. Section 548(a)(1)(A) of the Bankruptcy Code provides the criteria for determining whether transfers made prior to bankruptcy constitute actual fraud, and Section 548(a)(1)(B) provides the criteria for determining whether transfers made prior to bankruptcy constitute constructive fraud. A finding of actual fraud necessitates an examination of the debtor's intent, while a finding of constructive fraud can be made without

regard to the transferor's intent and is determined by examining the circumstances surrounding the transfer. The portion of Section 548 governing constructive fraud states:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
>> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>
>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a).

■ In fraudulent conveyance actions, the trustee has the burden of proof on all issues. *In re Rodriguez*, 895 F.2d 725, 726 n. 1 (11th Cir.1990); *In re Vurchio*, 107 B.R. 363, 364 (Bankr.M.D.Fla. 1989) (*citing In re Damason Construction Corp.*, 101 B.R. 775, 777 (Bankr.M.D.Fla. 1989)). Therefore, to prevail on a claim of constructive fraud under Section 548(a)(1)(B), the Trustee must demonstrate the following elements:

(1) the debtor had an interest in property;

(2) the transfer of that interest occurred within one year of the bankruptcy petition;

(3) the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and

(4) the debtor received less than reasonably equivalent value in exchange for such transfer.

*In re XYZ Options, Inc.*, 154 F.3d 1262, 1275 (11th Cir.1998). The Trustee asserts

that three series of transfers by the Debtors to Ransom are avoidable fraudulent transfers. The Trustee challenges the Debtors' $50,000.00 wedding gift to Ransom made in May, 1998. The Trustee also asserts the Debtors' other payments to Ransom spanning the time period from 1996 to 1998, and the Debtors' transfer of their interest in PMS to Ransom, are avoidable transfers.

■■■■ *The $50,000.00 Gift to Ransom.* On May 28, 1998, approximately nine months prior to filing this case, the Debtors gave Ransom and her husband a check in the amount of $50,000.00 drawn on the Debtors' Barnett Bank checking account. (Ransom's Exhibit No. 1). Mrs. Green testified that the $50,000.00 gift arose out of the Debtors' offer to pay for Ransom's wedding or to give Ransom a gift of cash in lieu of paying for her wedding. Ransom elected to accept the gift of cash. Therefore, although the check was jointly payable to Ransom and her new husband, the Court finds that Ransom alone elected to receive the cash gift and the intent of both the Debtors and Ransom was that the gift was to Ransom alone to use as she wished.

The Debtors' gift to Ransom constituted a voluntary transfer of an interest in the Debtors' property made within one year of this bankruptcy. Therefore, elements one and two under Section 548(a)(1)(B) are met. Additionally, the Debtors were clearly either insolvent at the time the gift was made or were rendered insolvent as a result of the gift. The Debtors gave the $50,000.00 check to Ransom at the end of May, 1998. The evidence at trial showed that, at or around the same time, the Debtors defaulted on the mortgage payments on their Virginia and Florida homes. (Trustee's Exhibit Nos. 17 & 18). Additionally, the Debtors defaulted on car payments and had liquidated certain other

accounts around this same time period. The Debtors apparently stopped paying all their legitimate creditors at the same time they gave their daughter $50,000.00. The Debtors presented no credible evidence that they were otherwise solvent in May 1998, when the gift was made. The Debtors listed non-exempt assets of only $14,000.00 a few months later. Therefore, the third element of constructive fraud, a showing of insolvency, is met.

Finally, Ransom gave no consideration for the Debtors' gift. The Debtors received less than reasonably equivalent value in exchange for the transfer. The Debtors understandably felt a moral or family obligation to pay for Ransom's wedding or to give her a sizeable wedding gift; however, the Debtors had no legal duty to do so. "The object of section 548 is to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property." *Walker v. Treadwell (In re Treadwell)*, 699 F.2d 1050, 1051 (11th Cir.1983). Love and affection are not adequate consideration and will not protect transfers from the Trustee. *Id.* "[T]he depletion of resources available to creditors cannot be offset by the satisfaction of moral obligations." *In re Guerrera*, 225 B.R. 32, (Bankr.D.Conn. 1998) (Any moral obligation debtor felt towards her sister because her sister provided food, clothing and other support to the debtor and her children was not in the nature of a legal debt and did not amount to reasonably equivalent value where debtor used sister's credit card and then paid entire outstanding balance on card when debtor only owed a portion of the balance). The Trustee has established the necessary elements of constructive fraud under Section 548(a) with regard to the $50,000.00 gift. Therefore, it is unnecessary to determine whether the Debtors intended to commit actual fraud by this transfer.

Section 550(a) gives the Trustee the ability to avoid the $50,000.00 transfer to Ransom. The purpose of Section 550 is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *In re American Way Service Corp.,* 229 B.R. 496, 530–31 (Bankr. S.D.Fla.1999) (*citations omitted*). Section 550(a) provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550. Here, the Debtors' gift to Ransom removed $50,000.00 from the estate. Accordingly, under Section 550, the Trustee is entitled to recover $50,000.00 from Ransom.

■ The Other Payments to Ransom. The Trustee alleges that certain payments made by the Debtors to Ransom or on Ransom's behalf between 1996 and 1998 are fraudulent transfers. The Trustee seeks to use Section 548 and various fraudulent transfer provisions of Florida state law to avoid the numerous small payments made by the Debtors to Ransom between January 15, 1996, through January 24, 1998. The size of the individual transfers ranged from $29.75 up to $6,615.93 and totaled $33,252.33.[17]

The undisputed testimony of both Mrs. Green and Ransom indicates that Ransom routinely performed house maintenance and shopping errands for her parents. Ransom purchased items such as furnishings for the Debtors' home and gifts for the Debtors' employees or business associates at the Debtors' direction. Ransom also paid utility bills and other expenses on the Debtors' behalf when the Debtors were away from their Florida home. Although some of the checks to Ransom were in round numbers as opposed to common shopping charges in uneven amounts and while *some* of the checks may have been general spending money or a gift to Ransom, the Trustee simply failed to prove which, if any, checks were gifts to Ransom and which checks were used to pay the Debtors' living expenses. The vast majority of the notations on the check register indicate the funds went for the Debtors' living expenses. Very little, if any, evidence was produced to contradict the testimony given by Ransom and Mrs. Green. Therefore, the Trustee has not proven that any of the itemized transfers to Ransom between January 15, 1996, and January 24, 1998, were fraudulent. Nor has the Trustee demonstrated that the Debtors were insolvent during that period or whether Ransom gave valuable consideration in exchange for the payments. Thus, the payments will not be avoided.

Finally, the Trustee conceded that the evidence surrounding the Debtors' transfer of PMS to Ransom was insufficient to establish a fraudulent transfer. No specific evidence was adduced at trial indicating how or why this transfer could be deemed fraudulent. The Trustee can not avoid the transfer of this interest.

Accordingly, in adversary proceeding 00–58, the Trustee has proven the $50,000.00 wedding gift is an avoidable

**17.** Appendix A, consisting of a list of numerous transfers by date and amount, is available upon request.

fraudulent transfer, but the Trustee otherwise failed to prove Ransom received any additional fraudulent transfers from her parents.[18] A judgment will be entered in favor of the Trustee and against the Debtors and Ransom that directs Ransom to turnover $50,000.00 to the Trustee for administration in connection with this case.

*Trustee's Objection to the Debtors' Exemptions and Motion for Turnover.* In the Objection, the Trustee argued that the Debtors are not entitled to claim as exempt any of the assets the Debtors failed to disclose on their initial schedules but later disclosed on their amended schedules and claimed as exempt. The Trustee maintains that the Debtors' omission of the assets from the initial schedules results in the loss of the assets' exempt status. To that end, the Trustee also filed her Motion seeking turnover of all of the assets disclosed on the Debtors' amended schedules.

Section 541 of the Bankruptcy Code defines property of the estate to include all legal or equitable interests of a debtor in property as of the commencement of a bankruptcy case. In this case, the Debtors do not dispute that their annuity, life insurance policies, and IRAs qualify as property of the bankruptcy estate.[19] Indeed, a debtor's property must come into the bankruptcy estate as a precursor to being exempted out of the estate under either federal or state exemption statutes. *See In re Corbi,* 149 B.R. 325, 329 (Bankr.E.D.N.Y.1993) (*citation omitted*).

At issue before this Court then, is whether the Debtors are entitled to exempt the assets listed on their amended schedules. The Trustee must prove, by a preponderance of the evidence, that the Debtors are not entitled to the exemptions claimed. *In re Allen,* 203 B.R. 786, 791 (Bankr.M.D.Fla.1996) (*citing In re Rightmyer,* 156 B.R. 690, 692 (Bankr.M.D.Fla. 1993)). Once the Trustee has made a prima facie showing that the claimed exemptions should be disallowed, the burden shifts to the Debtors to prove that the exemptions are legally valid. *Id.*

States can elect to "opt out of the federal scheme of exemptions in favor of state established exemptions." *Goldenberg v. Sawczak,* 791 So.2d 1078, 1080 (Fla. 2001) (*citing* 11 U.S.C. § 522(b) (1994)). The State of Florida elected to opt out of the federal scheme, and the Debtors claimed their annuity, life insurance policies, and IRAs as exempt under Florida law. The Debtors claim exemptions for their life insurance policies and annuity under Florida Statute § 222.14 and claim an exemption for their IRAs under Florida Statute § 222.21. Those statutes and their captions provide, in relevant part:

*222.14. Exemption of cash surrender value of life insurance policies and annuity contracts from legal process*

The cash surrender values of life insurance policies issued upon the lives of citizens or residents of the state and the proceeds of annuity contracts issued to

---

**18.** In Count II of the Complaint filed in adversary proceeding 00–58, the Trustee also alleged that the Debtors converted non-exempt assets to facially exempt assets within the year prior to bankruptcy. The vast majority of the assets claimed as exempt by the Debtors originated from Pan American retirement benefits existing in 1993, if not earlier. At trial, the Trustee failed to present sufficient evidence to prevail on this allegation.

**19.** In the Eleventh Circuit it is arguable that IRAs are not property of the estate. *See In re Meehan,* ·102 F.3d 1209, 1214 (11th Cir.1997) (holding that because a debtor's property was subject to a statutory restriction, the property was properly excluded from the estate under Section 541(c)(2)). In this case, however, the Debtors did not dispute the status of their IRAs, annuity, or life insurance policies as property of the estate.

citizens or residents of the state, upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected for the benefit of such creditor.

Fla. Stat. § 222.14 (2000).

*222.21. Exemption of pension money and retirement or profit-sharing benefits from legal processes*

(2)(a) Except as provided in paragraph (b), any money or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in, a retirement or profit-sharing plan that is qualified under s. 401(a), s. 403(a), s. 403(b), s. 408, s. 408A, or s. 409 of the Internal Revenue Code of 1986, as amended, is exempt from all claims of creditors of the beneficiary or participant.

Fla. Stat. § 222.21 (2000).

■ As stated above, the Trustee concedes that the Debtors' annuity and all but one of the Debtors' individual retirement accounts were funded by Dr. Green's Pan American pension. Under ordinary circumstances, this might support an inference that the Debtors' exemptions should be permitted. Moreover, as a general rule, debtors may freely amend their schedules absent "exceptional circumstances." *See Matter of Yonikus*, 996 F.2d 866, 872 (7th Cir.1993). Under Bankruptcy Rule 1009, a debtor's schedules may be amended by the debtor as a matter of course at any time before the case is closed. Fed. R. Bankr.P. 1009. Here, however, the Trustee argues, first, that the Debtors' exemptions are barred pursuant to Section 522(g) of the Bankruptcy Code because the Debtors initially concealed these assets and, second, that the debtors claimed the exemptions in bad faith to the prejudice of their creditors.

■ Initially, addressing the Trustee's argument under § 522(g), the statute provides, in part:

(g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if—

(1) (A) such transfer was not a voluntary transfer of such property by the debtor; and

(B) the debtor did not conceal such property[.]

11 U.S.C. § 522. In *In re Scholl*, 1998 WL 546607 (Bankr.E.D.Pa.1998), the Bankruptcy Court for the Eastern District of Pennsylvania considered whether a trustee was permitted to use § 522(g) to bar a debtor's exemptions in property that the debtor failed to disclose on his original schedules and that the trustee had not avoided or recovered under any of the Bankruptcy Code sections specifically enumerated in § 522(g). The Bankruptcy Court for the Eastern District of Pennsylvania clarified the limitations on the use of Section 522 to prohibit exemptions in property a debtor conceals. The Court explained:

Under § 522(g) a debtor is permitted to exempt property recovered by a trustee through the use of his turnover or avoidance powers to the same extent the debtor could have exempted the property if it was possessed by the debtor at

the beginning of the case.[20] Subsection 522(g)(1), relied upon by the trustee, limits a debtor's ability to exempt such property [to situations where] the debtor had attempted to hide [the property] prior to the trustee effecting a recovery. The section is not applicable in the present case because the [Debtor's property] has always been in the Debtor's possession and has never been the subject of any type of avoidance or recovery action initiated by the trustee. *In re Scholl*, 1998 WL 546607, (Bankr. E.D.Pa.1998).

■ Here, as in *Scholl*, the Trustee neither avoided nor recovered any of the property the Debtors claim as exempt on their belatedly amended schedules.[21] The Trustee did file a Motion for Turnover of Property of the Estate (Doc. No. 44) pursuant to § 542(a), but the Trustee did not actually bring any property into the estate that was not already in the Debtors' possession. Accordingly, the Trustee's argument that she can use § 522(g) to prohibit the Debtors' exemptions is inapposite.

■ Next, the Trustee argues that the exemptions are improper because the Debtors claimed the exemptions in bad faith after initially concealing the assets and allowing the exemption at this late date would prejudice creditors. The Trustee relies on binding precedent of the Eleventh Circuit Court of Appeals which ruled that in certain exceptional circumstances a debtor may not exempt property omitted from a debtor's initial schedules. *Matter of Doan*, 672 F.2d 831, 833 (11th Cir.1982). In *Doan*, the Eleventh Circuit endorsed the "permissive approach" to the amendment of schedules. Under this approach, a debtor's schedules, including lists of exempt property, may be amended at any time before the case is closed with the "limited caveat that a court might deny leave to amend on a showing of a debtor's bad faith or of prejudice to creditors." *Doan*, 672 F.2d at 833 (discussing Fed. R. Bankr.P. 110, predecessor to Fed. R. Bankr.P. 1009).

In *Doan*, the Court held that there was no bad faith and no prejudice to creditors and that the Debtors' exemption should have been allowed where: (i) the Debtors disclosed an anticipated tax refund in their initial filing; (ii) the Trustee informed the Debtors' attorney that there was no lien on the refund; (iii) Debtors later received and spent the refund on the advice of their attorney; (iv) Debtors readily submitted *all* information regarding the refund promptly to the Trustee upon the Trustee's inquiry; and, (v) Debtors shortly thereafter amended their schedules to reflect the refund. The Eleventh Circuit held that the Debtors' "sole default lay in not informing the trustee immediately after receiving the refund." *Doan*, 672 F.2d at 833. Thus, unlike the Debtors in the instant case, the Debtors in *Doan* evinced no bad faith because they *repeatedly* and *voluntarily* disclosed that they expected a tax refund. They promptly provided all information requested by the Trustee and timely amended their schedules. In addition, the Debtors did not spend the refund until they first checked with their attorney to see whether or not they could spend the funds.

Also, unlike the situation at bar, in *Doan*, no creditors were prejudiced by the

---

**20.** *Internal citation omitted.*

**21.** In this ruling, the Trustee can avoid the $50,000.00 transfer to Ransom pursuant to § 550. However, this recovery is not relevant to the issue of whether the Debtors' exemp-

tions, as claimed in the main case, can be prohibited under § 522(g) because the Debtors did not claim an exemption in the $50,000.00 transferred to Ransom.

Debtors' delay in filing amendments to their schedules. The Eleventh Circuit reasoned that "[s]imple delay in filing an amendment where .... the case is not closed does not *alone* prejudice creditors." *Matter of Doan,* 672 F.2d at 833 (*emphasis added*). Prejudice to creditors does not occur "merely because a claimed exemption, if held timely, would be granted." *Id.* at 833. Here, however, belated amendments are not the only problem, and the Debtors' eighteen-month delay in amending their schedules cannot be characterized as a simple delay.

The Seventh Circuit Court of Appeals also endorses the "permissive approach" to schedule amendments where assets are concealed. In *Yonikus,* the Seventh Circuit cited the reasoning of one of its earlier opinions regarding whether to permit the debtors' amendment of schedules where the debtors concealed assets:

> [A]lthough amendments before discharge are liberally allowed it is most unlikely that the [debtors] would be permitted to amend. The [debtors'] omissions from the initial list suggest that they meant to hide assets if they could get away with it.... The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.

*Yonikus,* 996 F.2d 866, 872 (*citing Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985), *cert. denied,* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986)).

▮▮▮ In this case, the Debtors waited eighteen months to amend their schedules. During that period, or at least until this Court froze the accounts in May, 2000, the Debtors had full access to the deposited funds. The Debtors made numerous withdrawals from the accounts both pre-petition and post-petition. Although the Trustee has now identified these withdrawals, the Debtors still have not documented the recipients of all of these withdrawals or otherwise accounted for the use of these funds. If the Debtors had timely scheduled these accounts, the Trustee could have prevented many of these withdrawals, all of which prejudiced creditors.

Moreover, creditors directly were prejudiced by the fact that the Trustee had to expend extraordinary legal fees and investigative costs, estimated to exceed $47,000, simply to glean the information she discerned. These costs, dollar for dollar, prejudice creditors in this case insofar as the costs constitute administrative expenses that are paid prior to the Debtors' unsecured creditors. If the Debtors were initially forthright, the Trustee would not have incurred any of the costs.

Lastly, the Court specifically finds the Debtors acted in bad faith by concealing the late scheduled assets. Apparently, the Debtors wanted to maintain control of the assets as long as possible to maintain access to the funds. For these reasons, and in this exceptional circumstance, the Court finds that, due to the Debtors' own delay and actions, the Debtors waited too long to amend their schedules and claim the belatedly scheduled assets exempt, with one exception—the Debtors' annuity.

On the Debtors' initial Schedule I, the Debtors listed monthly pension and retirement income of $730.00 which originated from this annuity. Because the Debtors initially disclosed this income, albeit not in a detailed fashion and not on the proper schedules, the Debtors should be permitted to amend their schedules to better identify the annuity and claim its payments as exempt. As to the remainder of the assets claimed exempt by the Debtors on their amended schedules, the Trustee's objection is sustained.

The Debtors cannot amend their schedules to claim the following property as exempt: (i) the Hartford Life insurance policy; (ii) the Old Line Life insurance policy and the Jackson National Life insurance policy, to the extent that the policies still exist; and, (iii) all nine of the Debtors' IRA accounts. The Debtors are directed to turnover these assets to the Trustee, and the injunction in place is dissolved with directions that all accounts, funds, documents and indicia of ownership relating to these accounts shall be turned over to the Trustee. The Debtors are entitled to retain all ownership of the annuity account.

Further, the Debtors stipulated that their checking accounts at Scotia Bank, Lloyds Bank, Pan Am Horizons Federal Credit Union, and F & M Bank of Northern Virginia are not exempt. The Debtors exhausted their ordinary $2,000.00 personal property exemption earlier in the case. For these same reasons, the Debtors' other listed checking account, T. Rowe Price account 520091946–2, also is not exempt, to the extent the account still exists. Thus, the Debtors must turnover the account balances in all five non-exempt bank accounts to the Trustee.

The Court is well aware that this decision will have continuing negative consequences for the Debtors. However, the facts of the case justify the result. The Court cannot sanction the Debtors' concealment of assets or reward the Debtors' recalcitrance with a discharge. The Debtors' partial disclosure of information early in the case in response to the Trustee's repeated questioning and document requests does not mitigate their initial concealment of assets and overall failure to explain their loss of income and lack of assets. The Debtors cannot be permitted to claim exemptions in property that was first concealed, used at the Debtors' discretion, and then later scheduled only for the purpose of claiming exemptions on the eve of trial. Bankruptcy is designed to assist the honest debtor, not reward the debtor who does not follow the rules.